**DORMONT BOROUGH, Petitioner**

v.

**PENNSYLVANIA LABOR RELATIONS BOARD, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Dec. 3, 2001.

Decided Jan. 4, 2002.

Publication Ordered March 20, 2002.

Richard D. Miller, Pittsburgh, for petitioner.

James L. Crawford and Jack E. Merino, Harrisburg, for respondent.

Gary M. Lightman, Harrisburg, for intervenors, Dormont Borough Police Ass'n, Dormont Desk Officers and Fire Apparatus Officers.

Before COLINS, Judge,
LEADBETTER, Judge, and
McCLOSKEY, Senior Judge.

Opinion by Senior Judge McCLOSKEY.

Dormont Borough (the Borough) petitions for review of an order of the Pennsylvania Labor Relations Board (Board), sustaining that portion of a hearing examiner's proposed decision and order which concluded that the Borough had committed unfair labor practices in violation of Sections 6(1)(a) and (e) of the Pennsylvania Labor Relations Act (PLRA)[1] and what is commonly referred to as Act 111.[2] We now affirm.

The Dormont Borough Police Association (the Association) is the exclusive representative of the Borough's police officers pursuant to the PLRA and Act 111.[3] The Association also serves as the exclusive representative of the Borough's desk/fire officers under these Acts. The desk/fire officers perform dispatching and clerical duties for the Borough's police department as well as fire fighting duties for the fire department.[4] The Borough is the municipal employer of both bargaining units' members under the PLRA and Act 111.

In early 1999, the Borough informed all police and desk/fire officers of its intention to construct a new municipal building to house the officers. The Borough made the design and construction drawings available to the officers for comments and suggestions. In the summer of 1999, the Borough began construction of this new building. From September of 1999 until the project's completion, the Borough provided the officers with tours of the new building. The construction was completed early in December of 1999, with the lockers being one of the last items installed at the new building.

On December 13, 1999, the police department and the desk/fire officers were relocated to the new municipal building.[5] In the old building, the basement was converted to a locker room for the police officers and several officers had their own lockers. Some officers were required to

---

**1.** Act of June 1, 1937, P.L. 1168, *as amended*, 43 P.S. § 211.6(1)(a), (e).

**2.** Act of June 24, 1968, P.L. 237, *as amended*, 43 P.S. §§ 217.2–217.10. Act 111 applies exclusively to police and fire personnel. Section 1 of Act 111, 43 P.S. § 217.1, provides, in part, that "[p]olicemen or firemen employed by a political subdivision of the Commonwealth .... shall .... have the right to bargain collectively with their public employers concerning the terms and conditions of their employment, including compensation, hours, working conditions, retirement, pensions and other benefits."

**3.** The Borough employs a police chief, thirteen police officers and several desk/fire officers.

**4.** The desk/fire officers do not exercise police powers. Nevertheless, as they also perform fire fighting duties, they are classified as a separate bargaining unit under Act 111.

**5.** There is no dispute that the new building was a great improvement over the outdated and cramped quarters of the parties' former facility.

share a locker with another officer.[6] Each desk/fire officer also had his or her own locker in the hallway outside of the police officers' locker room. Additionally, the police chief had his own locker separate from the locker room.

The Borough expects all police officers to wear clean uniforms while on duty and they are responsible for their own cleaning.[7] The desk/fire officers are also required to wear uniforms. The actual lockers assigned to the desk/fire officers in the old building were slightly smaller than the lockers assigned to the police officers. However, both types of lockers were deep enough to accommodate freshly pressed uniforms and other civilian attire on hangers. The lockers were also used to store equipment, such as guns, gun belts, a ballistic vest and a duty bag,[8] as well as personal effects, jackets, rain gear and several types of footwear depending on the weather.

Each police officer has been provided with his or her own locker in the locker room of the new municipal building. Nonetheless, these new lockers are not deep enough to accommodate uniforms or attire on hangers or certain types of footwear. Moreover, although these new lockers have hooks upon which uniforms and attire may be hung, without hangers, one jacket hung in this manner essentially occupies all of the available space. The desk/fire officers have not been provided with lockers in the new building. Instead, these officers have been assigned a desk drawer, which is too small to accommodate a uniform. In the alternative, there are lockers available to these officers at a firehouse across the street from the new building, but these lockers are made of wire mesh and do not have opaque doors or storage compartments that can be secured.

On November 25, 1999, Brant Bertha, a desk/fire officer and a member of the desk/fire officers' bargaining committee, sent an e-mail message to the Borough's manager, Deborah Grass. In his e-mail, Mr. Bertha indicated that he had been informed that desk/fire officers would not receive lockers in the new building and inquired as to the veracity of this statement.[9] Two days later, on November 27, 1999, Ms. Grass responded to Mr. Bertha's e-mail, confirming that desk/fire officers would not receive lockers in the new building. Ms. Grass indicated that uniforms and equipment for these officers should be stored at the firehouse across the street. Ms. Grass also indicated that desk/fire officers would be provided with a non-secured mail box that is mounted in the police desk area and a coat rack for the storage of rain coats and jackets.[10]

On December 3, 1999, Sergeant Gregory Joyce, the police officers' union represen-

---

6. At most, only two officers shared one locker. Additionally, the police chief had his own locker separate from the locker room.

7. When the Borough hires police officers, it provides them with $1,000.00 to purchase uniforms and equipment. In addition, the officers receive an annual uniform and equipment allowance of $550.00 per year.

8. The duty bag could contain such items as accident reports, traffic citations, flashlights, nightsticks, gloves, extra hats, vehicle lock-out tools and statutory enactments.

9. Mr. Bertha's e-mail further noted the nature and extent that desk/fire officers utilize their lockers.

10. In her e-mail, Ms. Grass further opined that desk/fire officers should not need securable locker space, that such space is necessary for the storage of police officers' weapons and that any personal effects should remain at home.

tative, sent Ms. Grass an e-mail message, asserting that the insufficiency of the new lockers was an issue of safety and collective bargaining. Ms. Grass responded by indicating that nothing would be done regarding the lockers prior to the move to the new building, as the design plans were readily available for comment and suggestions for some time, the lockers are standard size for new installations, there is no workplace safety issue and the lockers are the property of the municipality.[11] Subsequent to this response, the Borough unilaterally decided to place three new, larger freestanding lockers in the hallway outside of the locker room which can easily accommodate hangers.[12]

On January 10, 2000, the Association filed charges of unfair labor practices against the Borough on behalf of the police and desk/fire officers. These charges essentially alleged that the Borough, by failing to provide the two groups of officers with lockers in the new municipal building that contain equivalent, usable, securable storage space, had effected a unilateral change in working conditions in violation of Sections 6(1)(a) and (e) of the PLRA and Act 111.[13] The Secretary of the Board thereafter issued a complaint and notice of hearing for the charges on behalf of each bargaining unit. At the same time, the Secretary consolidated the cases for hearing purposes.

A hearing was held before a Board hearing examiner on May 3, 2000. At this hearing, Sergeant Joyce testified on behalf of the Association, specifically describing the size and uses of the lockers at the prior municipal building. Sergeant Joyce then described the insufficient size of the lockers at the new municipal building. Sergeant Joyce next described his aforementioned e-mail message to Ms. Grass and her response. The Borough then offered the testimony of Ms. Grass on its behalf. Ms. Grass began by briefly describing the construction process the Borough underwent for its new municipal building, including allowing the officers to pose comments or suggestions regarding the design plans.

Ms. Grass next discussed her e-mail correspondence with both Sergeant Joyce and Mr. Bertha.[14] On cross-examination, Ms. Grass was questioned regarding whether or not the design plans made available to the officers contained actual locker dimensions. Ms. Grass indicated that she "can't testify to that amount of detail" and that she could not say whether or not said plans actually showed individual lockers. (R.R. at 105a). Finally, the Borough presented the testimony of its Chief of Police, Russell McKibben. Chief McKibben also briefly described the Borough's construction process and his level of involvement in the same. Chief McKibben reiterated that

---

11. Further, Ms. Grass noted that the overall working conditions in the new building provide "substantially higher quality, efficiency and safety for employees than the old working conditions in every area." (*See* Hearing Examiner's Proposed Decision and Order, Finding of Fact No. 27, R.R. at 155a).

12. Nevertheless, there are four police officers assigned to each of these lockers.

13. Following the filing of these charges, the Borough again unilaterally installed a fourth larger locker in the hallway outside the new locker room.

14. In the course of this hearing, the Borough contended that the unfair practice charges of each bargaining unit, the police officers and the desk/fire officers, were untimely filed. With regard to the latter, the Borough cited to Mr. Bertha November 25, 1999, e-mail to Ms. Grass, which indicated that he was aware before that time of the lack of lockers for personnel in his position. With regard to the former, the Borough cited to the officers' ability to review and comment on design plans and to tour the new building.

the design plans were made available for inspection by his officers and that tours of the new building took place between September and December of 1999.

Ultimately, the hearing examiner issued a proposed decision and order concluding that the Borough had committed unfair labor practices in violation of Sections 6(1)(a) and (e) of the PLRA and Act 111. The hearing examiner further concluded that these charges had been timely filed and that the matter of adequate, securable locker space is a mandatory subject of bargaining. The Borough thereafter filed exceptions to the proposed decision and order challenging these conclusions. The Board issued a final order essentially dismissing the Borough's exceptions and making the proposed decision and order final and absolute.[15] The Borough then filed a petition for review with this Court and the Association filed a notice of intervention.

On appeal,[16] the Borough first argues that the Board erred as a matter of law in failing to conclude that the unfair labor charges filed on behalf of both the police and desk/fire officers were untimely. We disagree.

Section 9(e) of the PLRA, 43 P.S. § 211.9(e), provides, in pertinent part, that "[n]o petition or charge shall be entertained which relates to acts which occurred or statements which were made more than six weeks prior to the filing of the petition or charge." However, the statute of limitations does not begin to run unless the complainant, in this case, the Association, knows or should have known of the acts or circumstances giving rise to the harm and the cause of action. *See Fraternal Order of Police Haas Memorial Lodge #7 v. Pennsylvania Labor Relations Board,* 696 A.2d 873 (Pa.Cmwlth.1997).

Regarding the police officers, the Borough argues that said officers were aware of the size of the new lockers as early as February of 1999, when the Borough made the design plans available to the same for review and comments. The Borough also notes that it provided tours of the new building to officers between September and December of 1999. However, at the May 3, 2000, hearing, the Borough was unable to produce any design plans allegedly provided to the officers that contained the actual locker dimensions. *See* R.R. at 92a. Additionally, neither Ms. Grass nor Chief McKibben was able to testify that the plans did contain these dimensions. *See* R.R. at 105a, 124a.

To the contrary, Sergeant Joyce, whose testimony the Board credited, indicated that the design plans did not provide dimensions or specifications for the new lockers. (R.R. at 80a). Sergeant Joyce further testified that, although he toured the new building during its construction, he did not become aware of the actual limited size of the new lockers until their installation in early December 1999. (R.R. at 71a, 79a). Thus, as the police officers were not aware of the new locker limitations until early December 1999 and the Association filed the unfair labor practices

---

**15.** The Borough filed no less than twelve exceptions to the hearing examiner's proposed decision and order. In actuality, the Board did sustain these exceptions in part. However, those exceptions are not presently at issue before this Court.

**16.** Our scope of review of a decision and order of the Board is limited to determining whether constitutional rights have been violated, whether errors of law were committed and whether the findings of fact were supported by substantial evidence. *See* Section 704 of the Administrative Agency Law, 2 Pa. C.S. § 704. *Fraternal Order of Police, Lodge No. 5 v. Pennsylvania Labor Relations Board,* 727 A.2d 1187 (Pa.Cmwlth.1999).

charges on their behalf on January 10, 2000, within the required six-week period, we cannot say that the Board erred in failing to conclude that said charges were untimely.

Regarding the desk/fire officers, the Borough argues that these officers were aware of the locker situation prior to November 25, 1999, the date of the e-mail sent by Mr. Bertha to Ms. Grass. More specifically, the Borough cites the language of that e-mail, which states that Chief McKibben had advised him "again" that there will be no locker space for desk/fire officers. (R.R. at 156a). However, as the Board properly notes in its opinion, at no point was Chief McKibben speaking on behalf of the Borough. Instead, the Borough did not notify the desk/fire officers of a lack of lockers until Ms. Grass responded to Mr. Bertha's e-mail message on November 27, 1999. As the desk/fire officers were not aware of a lack of lockers at the new building until this time and the Association filed the unfair labor practices charges on their behalf on January 10, 2000, within the required six-week period, nor can we say that the Board erred in failing to conclude that these charges were untimely.[17]

Next, the Borough argues that the Board erred as a matter of law in concluding that the matter of adequate, securable locker space is a mandatory subject of bargaining. Again, we disagree.

As noted above, Section 1 of Act 111 identifies six different terms and conditions of employment subject to mandatory bargaining, including "compensation, hours, working conditions, retirement, pensions and other benefits." 43 P.S. § 217.1. Since Act 111 does not specifically identify locker space as one of these conditions, even though it falls within the broader category of working conditions here, the law is well settled that the Board must apply a "rational relationship" test to determine whether such an issue is deemed bargainable or is an issue of managerial prerogative. *See Fraternal Order of Police, Lodge No. 5; Township of Upper Saucon v. Pennsylvania Labor Relations Board,* 152 Pa.Cmwlth. 530, 620 A.2d 71 (1993).

Under this test, an issue is deemed bargainable if it bears a rational relationship to the employees' duties. *Fraternal Order of Police, Lodge No. 5; Township of Upper Saucon.* On the other hand, "[f]or an issue to be deemed a managerial prerogative and thus not a mandatory subject of bargaining, the managerial policy must substantially outweigh any impact an issue will have on the performance of the duties of the police or fire employees." *Fraternal Order of Police, Lodge No. 5,* 727 A.2d at 1190. Furthermore, whether a given issue is a term or condition of employment or a matter of managerial prerogative should first be determined by the Board, which possesses administrative expertise in the area of public employ-

---

**17.** Moreover, we note, as did the Board, that the Board will dismiss a refusal to bargain charge as premature when an employer's unilateral action has not actually effected a change in the employees' conditions of employment or if the charge has been filed before the effect of such a change can be determined. *See Association of Pennsylvania State College and University Faculties v. Pennsylvania Labor Relations Board,* 661 A.2d 898 (Pa. Cmwlth.1995), *petition for allowance of appeal denied,* 542 Pa. 649, 666 A.2d 1058 (1995). Here, at the earliest, the police officers were aware of the changed employment condition when Sergeant Joyce toured the new building in early December, 1999, after installation of the new lockers, and the desk/fire officers were only first aware after Ms. Grass' November 27, 1999, e-mail or, alternatively, when they moved into the new building.

ee labor relations and must be given "great deference" in assessing "the often competing concerns between the employer and the union." *Fraternal Order of Police, Lodge No. 5,* 727 A.2d at 1191.

■ In this case, there is an abundance of evidence establishing that the issue of locker size is rationally related to the duties of police officers. As Sergeant Joyce indicated, the police and desk/fire officers are required to wear clean uniforms on a daily basis. The police officers must also maintain a change of clothes in the event that their uniform becomes soiled during a shift. This uniform consists of pants, a shirt, a jacket, boots and other types of clothing and footwear depending on the weather. The uniform also includes various equipment, such as a gun, gun belt, flashlight and nightstick. Additionally, the officers also carry duty bags, which can be filled with a variety of items.

The lockers in the old municipal building were large enough such that they could accommodate all aspects of the police officers' uniforms, as well personal effects and civilian clothing. The desk/fire officers even had their own lockers which enabled them to maintain a clean, pressed uniform at work and allowed them to change into uniform at work.[18] Obvious safety concerns are implicated if an officer is required to wear a uniform while off duty. In contrast, the police lockers in the new building do not accommodate the officers' needs. These lockers do not have the capacity to hold the same amount of clothing and equipment and are not even large

enough to hold a pressed uniform on a hanger. The desk/fire officers do not have any assigned lockers in the new building, only a desk drawer and non-securable wire mesh lockers across the street. We agree with the Board that the Borough's interest in construction and design of a physical plant does not substantially outweigh the impact on the officers' duties. Thus, we cannot say that the Board erred as a matter of law in concluding that the matter of adequate, securable locker space is a mandatory subject of bargaining.[19]

■ Next, the Borough argues that the Board erred as a matter of law in concluding that it did not satisfy its duty to bargain in good faith. Once more, we disagree.

Section 2 of Act 111 imposes a duty on all "public employers and their policemen and firemen employes to exert every reasonable effort to settle all disputes by engaging in collective bargaining in good faith." 43 P.S. § 217.2. In *Upper Moreland Township District v. Pennsylvania Labor Relations Board,* 695 A.2d 904, 908 (Pa.Cmwlth.1997), *petition for allowance of appeal denied,* 552 Pa. 698, 716 A.2d 1250 (1998), we defined "good faith" as making "a serious effort to resolve differences and reach a common ground."

In support of its argument, the Borough notes that it made the design plans available for the officers' review and also provided tours of the new building. However, the Borough neglects the fact that the evidence of record fails to identify even one instance where it discussed the matter

---

18. The desk/fire officers are also expected to wear uniforms and present a professional appearance at work.

19. In the course of this argument, the Borough avers that the Board erred by failing to establish or apply a workable standard to differentiate with predictable accuracy between a term or condition of employment and

a matter of managerial prerogative. In other words, the Borough suggests that the Board establish a laundry list of these items. However, such a list would be impracticable and impossible to establish. Matters such as these are traditionally very fact-specific and ordinary common sense must play an integral role in the resolution of the same.

regarding the size and dimensions of the new lockers with the Association, much less made "a serious effort to resolve differences and reach a common ground." *Upper Moreland,* 695 A.2d at 908. The Borough simply did not treat this subject as an issue subject to bargaining.[20] Thus, we cannot say that the Board erred as a matter of law in concluding that the Borough did not satisfy its duty to bargain in good faith.

Accordingly, the order of the Board is affirmed.[21]

## O R D E R

AND NOW, this 4th day of January, 2002, the order of the Pennsylvania Labor Relations Board is hereby affirmed.

---

**20.** Admittedly, the Borough added larger lockers outside of the new locker room. However, these lockers were added following the move to the new building and only after the Association expressed concerns over locker size. Nevertheless, these actions by the Borough do not relieve it of its obligation to participate in bargaining on this issue with the Association, something it did not undertake.

**21.** We note that the Borough raises additional arguments in its brief to this Court concerning the failure of the Association to demand bargaining and assigning the burden of notice to the Borough. However, these arguments are without merit. The Borough was the party seeking to alter the status quo and was the party most aware of the proposed changes. Thus, we agree with the Board that the burden was on the Borough to initiate bargaining.